IN THE UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF ARKANSAS
HOT SPRINGS DIVISION

SUSAN J. JOHNSON                                                    PLAINTIFF

VS.                                    CIVIL NO. 05-6037

JO ANNE B. BARNHART,
COMMISSIONER, SOCIAL SECURITY ADMINISTRATION                        DEFENDANT

## MEMORANDUM OPINION

Susan Johnson ("plaintiff"), brings this action pursuant to § 205(g) of the Social Security Act

("the Act"), 42 U.S.C. § 405(g), seeking judicial review of a final decision of the Commissioner of

the Social Security Administration denying her application for disability insurance benefits ("DIB"),

under Title II of the Act.

## Background:

The application for DIB now before this court was protectively filed on March 14, 2003,[1]

alleging an onset date of November 14, 2002, due to degenerative disc disease ("DDD"), two prior

cervical fusion surgeries to the neck, pain in the left arm, a problem with her right foot, problems

with her right hand and wrist, and a bone in her neck that affects her breathing and eating. (Tr. 59-

62, 93). An administrative hearing was held on August 3, 2004. (Tr. 251-287). Plaintiff was

present and represented by counsel.

On January 27, 2005, the Administrative Law Judge ("ALJ"), issued a written opinion

finding that plaintiff's cervical DDD, residual impairments from two surgical procedures, mal-union

of a right wrist fracture, fractured right ankle, depression, anxiety, and pain were severe impairments,

---

[1]On October 2, 1996, plaintiff protectively filed a previous DIB application, alleging
an onset date in 1994, due to a neck injury she sustained at work. (Tr. 12). Her claim was
initially denied on November 26, 1996, and plaintiff failed to pursue it further. (Tr. 12).

but did not meet or equal the criteria of any of the impairments listed in Appendix 1, Subpart P, Regulations No. 4. (Tr. 16). At this time, plaintiff was forty-five years old and possessed a high school education. (Tr. 12). The record reveals that she has past relevant work ("PRW"), as a laundry attendant, shrink wrapper, telemarketer, fast food counter clerk, and worker in a rubber band factory. (Tr. 12-13).

After discrediting plaintiff's subjective allegations, the ALJ concluded that she maintained the residual functional capacity ("RFC"), to perform the physical exertional and non-exertional requirements for a wide range of light, unskilled work. (Tr. 16). However, he noted that her RFC was diminished by her inability to work overhead; reach in all directions with her right wrist; perform activities requiring fine manipulation with the right wrist; and, do frequent, rapid, and repetitive flexion/extension movements with her right wrist. (Tr. 15, 17). Further, due to depression, the ALJ determined that plaintiff could perform work where the interpersonal contact was only incidental to the work performed, the complexity of the tasks was learned by experience, the judgment required was within limits, and the supervision required was little for routine tasks but detailed for non-routine tasks. With the assistance of a vocational expert ("VE"), the ALJ concluded that plaintiff could perform simple assembly and manufacturing jobs requiring one or two step procedures, such as assembling electrical equipment and inspector positions in the apparel textile industry. (Tr. 15-16).

On May 11, 2005, the Appeals Council declined to review this decision. (Tr. 4-6). Subsequently, plaintiff filed this action. (Doc. # 1). This case is before the undersigned by consent of the parties. Both parties have filed appeal briefs, and the case is now ready for decision. (Doc.

# 6, 7).

## Evidence Presented:

The medical evidence shows that in 1993, plaintiff had surgery on her right hand, and in 1995, underwent a cervical discectomy and fusion. (Tr. 145-159, 160-172). However, the fused cervical area later collapsed, causing plaintiff to develop pseudoarthrosis. This necessitated surgical revision in September 1996. (Tr. 145-159, 160-172). In July 1997, Dr. Michael Young, plaintiff's treating orthopedist, noted that plaintiff had reached her maximum medical improvement. (Tr. 160). He concluded that her neck condition constituted a twelve percent overall impairment. (Tr. 160)

In May 2002, plaintiff sought treatment for her "nerves." (Tr. 185). Xanax had reportedly been used in the past, but plaintiff felt like she was currently "too nervous" to use it. Her mother was a terminal cancer patient and her step-father was allegedly making it very difficult for her to stay at her mother's home and visit. Plaintiff had only been able to stay at her mother's house for thirty minutes on Mother's Day because her step-father made her mad. After her visit, plaintiff actually went so far as to research non-detectable poisons at the local library to use on her step-father. Plaintiff also reported episodes of driver rage. According to the records, one minute she would be fine, and the next minute she would fly off the handle. Plaintiff did not want to hurt herself or anyone else, so she requested treatment for anger management and anxiety. Dr. Richard Finch diagnosed her with anxiety and prescribed a Zoloft starter pack and Valium. (Tr. 185).

On August 29, 2002, plaintiff indicated that her anxiety was mostly provoked by her job and coping with her mother's death. (Tr. 182). BuSpar did not help unless she took it with Valium. Records indicate that plaintiff had also previously taken Zoloft, Paxil, Effexor, and Wellbutrin,

AO72A
(Rev. 8/82)

without improvement. She stated that she did not feel depressed, but rather was anxious. Dr. Finch diagnosed her with anxiety and prescribed Valium and Amitriptyline. (Tr. 182).

On November 18, 2002, plaintiff went to Dr. Finch with complaints of anxiety and lumbar and shoulder pain. (Tr. 179). He noted that she was having quite a bit of muscle spasms at the C7-T1 level. Dr. Finch opined that Valium helped her muscle spasms, as well as her anxiety. Further, he stated that it was synergistic with the Soma. After noting tenderness to palpation at the C6-7 and T1 levels; tenderness in the bilateral trapezius and bilateral parascapular musculature with mild to moderate hypertonicity; tenderness at the paravertebral musculature in the lumbar area; and, a couple of tender points, Dr. Finch diagnosed plaintiff with cervicalgia, thoracolumbar pain, bilateral shoulder pain, and epigastric abdominal pain. He then ordered blood tests; refilled her Soma, Diazepam, and Norco; and, ordered a physical therapy evaluation. (Tr. 179).

On May 30, 2003, at the request of the Social Security Administration, Dr. Michael Atta performed a physical examination of plaintiff. (Tr. 186-192). Plaintiff reported that she had developed left-sided weakness in 1994, while lifting a heavy object at work. (Tr. 186). She was allegedly diagnosed with a ruptured disc, underwent fusion surgery, and returned to work after seven and one-half months of recovery. However, the pain returned and she underwent a second cervical spine surgery in 1996. Then, in October 1998, plaintiff reportedly fractured her right wrist and one left rib in a motor-vehicle accident. (Tr. 186).

Upon examination, Dr. Atta noted that plaintiff had a normal range of motion in her lumbar spine, shoulders, elbows, wrists, hands, hips, and knees. (Tr. 189). However, the range of motion in her cervical spine, right wrist, and right ankle was limited. Further, Dr. Atta found evidence of

4

ulnar deviation in the right wrist. (Tr. 190). He also indicated that her grip strength in the right hand was eighty percent of normal. (Tr. 190). Dr. Atta opined that, due to plaintiff's arm and spine impairments, she had mild limitations in standing and walking, lifting and carrying, and head movements. (Tr. 192). Mentally, plaintiff was noted to be oriented to time, person, and place, and no evidence of psychosis was present. (Tr. 191).

On June 24, 2003, at the request of the Administration, plaintiff underwent a mental status examination by Dr. Michael Inman, a psychologist. (Tr. 193-199). Dr. Inman noted that plaintiff drove herself to the appointment, and reported driving everyday. Despite plaintiff's reports of problems with her right foot, Dr. Inman found no evidence of any problems with ambulation, observing that she walked with an erect posture and normal gait. Further, although she reported her average pain as a seven on a scale of one to ten, there was no behavioral evidence of pain, such as grimacing or moaning. (Tr. 193).

When questioned concerning her past psychiatric treatment, plaintiff stated that Dr. Mike Young had referred her to a psychiatrist sometime between 1994 and 1996, due to depression. (Tr. 194). She could not recall the psychiatrist's name, but stated that she had seen him approximately ten times and was prescribed antidepressants. At the current time, plaintiff described her mood as severely depressed and admitted to suicidal thoughts and crying spells. Plaintiff stated that she could "sit and cry all the time," was never happy, couldn't sleep, didn't have an appetite, didn't want anyone around, and hated the world because there was no use for her anymore." In spite of this, she denied any suicidal intent. (Tr. 194).

Upon evaluation, Dr. Inman reported that plaintiff's thought process was logical and

5

coherent, and her responses were spontaneous, well organized, and without evidence of blocking.

(Tr. 195). Plaintiff's affect was angry, and she appeared bitter and tearful when discussing her

mother's death. (Tr. 195). She was oriented times four, with reality testing intact, and her long-term

memory was grossly within normal limits. (Tr. 196). Plaintiff's concentration, persistence, and pace

were intact, and no physical problems or limitations that would interfere with her adaptive

functioning were observed. (Tr. 198-199). Although plaintiff had reportedly sustained a head injury

and loss of consciousness in 1998, Dr. Inman noted that there was no evidence that plaintiff had any

organic brain involvement. Accordingly, he diagnosed her with depressive disorder not otherwise

specified, pain disorder associated with both psychological factors and a general medical condition,

and generalized anxiety. Dr. Inman indicated that plaintiff's prognosis with treatment was "quite

good." (Tr. 197). However, he noted that she was neither in treatment nor seemed inclined to seek

treatment, without which her prognosis was poor. Further, Dr. Inman opined that plaintiff had the

ability to understand, carry out, and remember instructions, although her "anxious depression" and

"heightened irritability" made dealing with work pressures and co-workers somewhat difficult. In

spite of this, Dr. Inman noted that plaintiff's history did indicate a good ability to make adjustments.

(Tr. 199).

On November 6, 2003, plaintiff returned to Dr. Finch's office to discuss an abnormal pap

smear performed in 2001. (Tr. 250). Plaintiff reported left-sided chest pain that radiated into her

left shoulder. She also complained of depression, stating that she had stress-overlay depression. Dr.

Finch indicated that he had been called by a friend of plaintiff's who told him that plaintiff was

acting crazy and unbalanced, and selling her medications. When confronted with this information,

AO72A
(Rev. 8/82)

plaintiff denied selling her medication and questioned Dr. Finch as to why he did not drug test her. Dr. Finch noted that he had not prescribed any medication for plaintiff since November 2002. Further, he refused to give her any pain medication, preferring to refer her to a pain specialist. Plaintiff was diagnosed with chest pain, "doubt of cardiac origin"; elevated blood pressure, "doubt hypertension"; and, anxiety/depression. Dr. Finch prescribed Paxil and scheduled her for appointments with Drs. Mike Young and Gregory Slagle. (Tr. 250).

On February 20, 2004, plaintiff again sought treatment from Dr. Finch. She complained of neck, back, bilateral leg, and left hip pain. (Tr. 249). Plaintiff indicated that she had been involved in an automobile accident on February 13, 2004. She was reportedly treated in the emergency room via Lorcet, Skelaxin, and Motrin. At the time of her appointment with Dr. Finch, plaintiff stated that she felt "a little better." An examination revealed a normal range of motion, with tenderness in the posterior cervical musculature, bilateral trapezius, parascapular musculature, paravertebral musculature, and the sacroiliac ("SI") joints. Trigger points and spasms were also noted. Neurologically, her strength was 5/5 and equal, and there was no evidence of sensory neuropathy. Accordingly, Dr. Finch diagnosed plaintiff with cervicalgia (neck pain), thoracolumbar pain, and bilateral shoulder pain. He then prescribed Skelaxin, Norco, and Ibuprofen. Plaintiff was directed not to drive or use tools or alcohol while taking these medications. (Tr. 249).

On February 27, 2004, plaintiff was reportedly "a little bit better." (Tr. 248). Dr. Finch noted continued tenderness in the cervical spine, parascapular musculature, and paravertebral musculature of the thoracic and lumbosacral spine. Some trigger points were also present. As such, he diagnosed plaintiff with lower back pain, bilateral shoulder pain, thoracic spine pain, and cervicalgia. For this,

7

Dr. Finch prescribed a physical therapy evaluation, Soma, and Norco. Plaintiff was again directed not to drive or use tools or alcohol while taking these medications. (Tr. 248).

On March 12, 2004, plaintiff indicated that she had been to the emergency room the previous Tuesday and received a "pain shot." (Tr. 247). She stated that she was stiff all over and required pain medication to ambulate. Tenderness was noted in the parascapular musculature, trapezius, left posterior cervical musculature, and paravertebral musculature of the thoracic and lumbosacral spine. Plaintiff was diagnosed with right shoulder pain, cervicalgia, and lower back pain. Dr. Finch directed her to continue physical therapy for two weeks and prescribed Norco and Soma. The previous restrictions on driving, operating tools, and using alcohol were reiterated. (Tr. 247).

On March 26, 2004, plaintiff indicated that she had attended physical therapy for one week, but was unable to attend the previous week due to transportation problems. (Tr. 246). She had, however, been doing her exercises at home. Plaintiff reported that she did not think the Lexapro or pain medication was helping. Accordingly, Dr. Finch prescribed Effexor XR in the place of Lexapro and instructed plaintiff to only take Soma for her pain. He also encouraged her to arrange for transportation to and from her physical therapy sessions. (Tr. 246).

On April 15, 2004, plaintiff stated that she felt like she was losing strength in her left arm. (Tr. 245). She also reported no improvement in her lower back pain. Plaintiff indicated that she had not attended physical therapy due to neck pain. Dr. Finch noted tenderness to palpation at the bilateral SI joints and the paravertebral musculature with moderate spasm. There was also tenderness with moderate spasm and a few trigger points in the parascapular musculature. After diagnosing plaintiff with shoulder and lower back pain, Dr. Finch prescribed physical therapy, Soma,

8

and Norco. Once again, plaintiff was told not to drive or use tools or alcohol while taking these medications. (Tr. 245).

On April 30, 2004, although Dr. Finch noted improvement regarding plaintiff's back and shoulder condition, she continued to experience some level of pain. (Tr. 244). Further, the Effexor had improved her mood. An examination revealed moderate spasm in the right paraspinous musculature of the thoracic spine, between the shoulder blades. Further, the trigger points were softer in the parascapular region and the paraspinous region. Therefore, Dr. Finch diagnosed plaintiff with right shoulder pain, cervicalgia, and lower back pain. He prescribed Norco, Soma, Buspar, and Effexor. Dr. Finch also stated that he would consider an orthopedic referral. (Tr. 244).

On May 24, 2004, plaintiff was feeling better, but still stiff. (Tr. 243). Although her lower back pain had improved, she continued to experience pain in her shoulders. Dr. Finch noted tenderness and spasm in the bilateral parascapular musculature, especially in the subscapularis muscles on the left. Trigger points were also present that resolved easily with deep palpitation. As such, Dr. Finch performed a high-velocity low-amplitude technique ("HVLA"), on the ribs with good results. He then prescribed physical therapy, Norco, Soma, and Effexor XR. Dr. Finch warned plaintiff not to drive or use tools or alcohol while taking the Norco. (Tr. 243).

On June 14, 2004, plaintiff began reporting headaches. (Tr. 242). She opined that the physical therapy had not helped her very much. On examination, Dr. Finch noted markedly less trigger points and spasm of the bilateral parascapular musculature and paracervical musculature. As such, he diagnosed her with cervicalgia, lower back pain, and improved bilateral shoulder pain. For this, Dr. Finch prescribed Norco, Soma, and Effexor XR. He told her not to drive or use tools or

9

alcohol while taking these medications.  Dr. Finch voiced his belief that continued physical therapy would help plaintiff, but she stated that she did not want to go back.  (Tr. 242).

On July 12, 2004, plaintiff was reportedly about the same.  (Tr. 241).  She continued to suffer with headaches.  Dr. Finch noted that her paravertebral musculature, parascapular musculature and paracervical musculature were softer, but still exhibited a few trigger points.  Therefore, he diagnosed her with cervicalgia and prescribed Norco, Soma, Effexor XR, and Vistaril.  (Tr. 241).

On September 7, 2004, plaintiff had a follow-up appointment with Dr. Finch.  (Tr. 240).  Plaintiff's condition was said to be stable.  She reported an inability to tolerate work for very long at a time.  In fact, when she worked an hour extra at her part-time job, plaintiff reportedly had to go home and go to bed.  An examination revealed tenderness to palpation of the bilateral paracervical musculature with mild spasm, tenderness at the paravertebral musculature with more spasm on the left than right and more trigger points on the right, and parascapular musculature and bilateral trapezius tenderness.  Dr. Finch diagnosed plaintiff with cervicalgia and lower back pain.  He then prescribed Vistaril, Soma, and Norco.  Dr. Finch directed plaintiff not to drive, use tools, or drink alcohol while using these medications.  (Tr. 240).

In an undated letter to Medicaid, Dr. Donald Boos, Jr., stated that he was treating plaintiff for cervical DDD and possible cervical facet syndrome as well as myofascial pain syndrome.  (Tr. 200).  He indicated that she needed her vehicle for transportation to and from her medical appointments.  (Tr. 200).

**Applicable Law:**

This Court's role is to determine whether the Commissioner's findings are supported by

substantial evidence on the record as a whole. *Ramirez v. Barnhart*, 292 F.3d 576, 583 (8th Cir. 2002). Substantial evidence is less than a preponderance but it is enough that a reasonable mind would find it adequate to support the Commissioner's decision. The ALJ's decision must be affirmed if the record contains substantial evidence to support it. *Edwards v. Barnhart*, 314 F.3d 964, 966 (8th Cir. 2003). As long as there is substantial evidence in the record that supports the Commissioner's decision, the Court may not reverse it simply because substantial evidence exists in the record that would have supported a contrary outcome, or because the Court would have decided the case differently. *Haley v. Massanari*, 258 F.3d 742, 747 (8th Cir. 2001). In other words, if after reviewing the record, it is possible to draw two inconsistent positions from the evidence and one of those positions represents the findings of the ALJ, the decision of the ALJ must be affirmed. *Young v. Apfel*, 221 F.3d 1065, 1068 (8th Cir. 2000).

It is well-established that a claimant for Social Security disability benefits has the burden of proving her disability by establishing a physical or mental disability that has lasted at least one year and that prevents her from engaging in any substantial gainful activity. *Pearsall v. Massanari*, 274 F.3d 1211, 1217 (8th Cir. 2001); *see* 42 U.S.C. §§ 423(d)(1)(A), 1382c(a)(3)(A). The Act defines "physical or mental impairment" as "an impairment that results from anatomical, physiological, or psychological abnormalities which are demonstrable by medically acceptable clinical and laboratory diagnostic techniques." 42 U.S.C. §§ 423(d)(3), 1382(3)(c). A plaintiff must show that her disability, not simply her impairment, has lasted for at least twelve consecutive months.

The Commissioner's regulations require her to apply a five-step sequential evaluation process to each claim for disability benefits: (1) whether the claimant has engaged in substantial gainful

AO72A
(Rev. 8/82)

activity since filing her claim; (2) whether the claimant has a severe physical and/or mental impairment or combination of impairments; (3) whether the impairment(s) meet or equal an impairment in the listings; (4) whether the impairment(s) prevent the claimant from doing past relevant work; and, (5) whether the claimant is able to perform other work in the national economy given her age, education, and experience. *See* 20 C.F.R. §§ 404.1520(a)- (f)(2003). Only if the final stage is reached does the fact finder consider the plaintiff's age, education, and work experience in light of his or her residual functional capacity. *See McCoy v. Schweiker*, 683 F.2d 1138, 1141-42 (8th Cir. 1982); 20 C.F.R. §§ 404.1520, 416.920 (2003).

**Discussion:**

We first address the ALJ's assessment of plaintiff's subjective complaints. The ALJ was required to consider all the evidence relating to plaintiff's subjective complaints including evidence presented by third parties that relates to: (1) plaintiff's daily activities; (2) the duration, frequency, and intensity of his pain; (3) precipitating and aggravating factors; (4) dosage, effectiveness, and side effects of his medication; and (5) functional restrictions. *See Polaski v. Heckler*, 739 F.2d 1320, 1322 (8th Cir. 1984). While an ALJ may not discount a claimant's subjective complaints solely because the medical evidence fails to support them, an ALJ may discount those complaints where inconsistencies appear in the record as a whole. *Id*. As the United States Court of Appeals for the Eighth Circuit recently observed, "Our touchstone is that [a claimant's] credibility is primarily a matter for the ALJ to decide." *Edwards v. Barnhart*, 314 F.3d 964, 966 (8th Cir. 2003).

While we note that plaintiff has been diagnosed with cervicalgia, shoulder pain, lower back pain, and hip pain, we are also cognizant of the fact that her condition has responded to medication.

12

*See Roth v. Shalala*, 45 F.3d 279, 282 (8th Cir. 1995) (holding that a condition that can be controlled or remedied by treatment cannot serve as a basis for a finding of disability). In fact, on May 24, 2004, plaintiff indicated that she was feeling better. (Tr. 243). The following month, Dr. Finch noted markedly less trigger points and spasms of the bilateral parascapular musculature and paracervical musculature. (Tr. 242). Then, in September 2004, Dr. Finch indicated that her condition was stable. (Tr. 140).

It is also significant to point out that plaintiff did not attend physical therapy sessions as prescribed by Dr. Finch. (Tr. 242, 243, 245, 246). *See Dunahoo v. Apfel*, 241 F.3d 1033, 1038 (8th Cir. 2001) (holding that claimant's failure to follow prescribed course of treatment weighed against credibility when assessing subjective complaints of pain). Although Dr. Finch opined that physical therapy would be beneficial to plaintiff, she refused to complete the program. (Tr. 242). As such, we cannot say that her pain was as severe as alleged.

Although plaintiff contends that her failure to seek more frequent treatment for her condition and treatment non-compliance was excused by her financial situation, this assertion is belied by the fact that the record reveals that plaintiff remained able to purchase cigarettes. (Tr. 273). In addition, she has not attempted to obtain assistance from any facilities offering low-cost or indigent care. *Riggan v. Apfel*, 177 F.3d 689, 693 (8th Cir. 1999) (holding that although plaintiff claimed he could not afford medication, there was no evidence to suggest that he sought any treatment offered to indigents or chose to forgo smoking three packs of cigarettes a day to help finance pain medication); *Siemers v. Shalala*, 47 F.3d 299, 301 (8th Cir.1995) (plaintiff's allegations of financial hardship can be discredited by evidence of her ability to afford other expenses). Accordingly, we do not find her

13

non-compliance to be the result of her financial state.

We also note that plaintiff applied for, and collected, unemployment benefits, which suggests that she is not disabled. (Tr. 258). Plaintiff told Dr. Inman that she drew $724 per month in unemployment benefits until May 2003. (Tr. 195). The United States Court of Appeals for the Eighth Circuit has held that "a claimant may admit an ability to work by applying for unemployment compensation because such an applicant must hold himself out as available, willing, and able to work." *Johnson v. Chater*, 108 F.3d 178, 180-181 (8th Cir. 1997) (quoting *Jernigan v. Sullivan*, 948 F.2d 1070, 1074 (8th Cir. 1991)). Thus, plaintiff's receipt of unemployment benefits suggests that she was able to work during this time frame.

Plaintiff also reported returning to work after her alleged onset date. (Tr. 256). She testified that, in the weeks just prior to the administrative hearing, she had worked as a laundry attendant for approximately four or five weeks. (Tr. 256-257). Further, the week before the hearing, she worked at McDonalds for approximately one week. (Tr. 260). While these jobs do not rise to the level of substantial gainful activity, we note that working at a job while applying for benefits is an activity inconsistent with a party's claim of disability. *See Dunahoo v. Apfel*, 241 F.3d 1033, 1039 (8th Cir. 2001); *Starr v. Sullivan*, 981 F.2d 1006, 1009 n.3 (8th Cir. 1992).

Plaintiff's own reports concerning her activities of daily living also contradict her claim of disability. On a supplemental interview outline completed on April 17, 2003, plaintiff reported an ability to care for her personal hygiene; do the laundry, wash dishes, change the sheets, and shop for clothing with assistance; shop for groceries; prepare three meals per week; pay bills; occasionally count change; drive familiar and unfamiliar routes; watch TV; and, listen to the radio. (Tr. 76-77).

14

Further, plaintiff testified that she could lift fifteen to twenty pounds occasionally and over five pounds frequently. (Tr. 265). She also indicated that her average day consisted of getting up, preparing breakfast (eggs, bacon, toast), cleaning the house, loading the dishwasher, doing the laundry, taking care of her fifteen-year-old daughter, home schooling her daughter, and preparing lunch and dinner. (Tr. 267). She reported no difficulty maintaining attention or dealing with supervisors or co-workers. (Tr. 271, 272). Plaintiff further testified that she was able to watch television, play cards with her children, and visit her grandchild and friends. (Tr. 273). *See McGeorge v. Barnhart*, 321 F.3d 766, 768 (8th Cir. 2003)(holding that plaintiff was able to perform many of the activities associated with daily life); *Pena v. Chater*, 76 F.3d 906, 908 (8th Cir. 1996) (ability to care for one child, occasionally drive, and sometimes go to the store); *Nguyen v. Chater*, 75 F.3d 429, 430-31 (8th Cir. 1996) (ability to visit neighbors, cook, do laundry, and attend church); *Novotny v. Chater*, 72 F.3d at 671 (ability to carry out garbage, carry grocery bags, and drive); *Johnston v. Shalala*, 42 F.3d 448, 451 (8th Cir. 1994) (claimant's ability to read, watch television, and drive indicated his pain did not interfere with his ability to concentrate); *Woolf v. Shalala*, 3 F.3d 1210, 1213-1214 (8th Cir. 1993) (ability to live alone, drive, grocery shop, and perform housework with some help from a neighbor).

As for her mental limitations, the record does make clear that plaintiff suffered from depression and anxiety. (Tr. 179, 182, 185, 199, 241, 243, 244, 246, 250). In 2003, Dr. Inman noted that, with treatment, plaintiff's prognosis was "quite good." (Tr. 197). However, he also stated that plaintiff was neither in treatment nor seemed inclined to seek treatment for her condition. Following her evaluation by Dr. Inman, plaintiff was treated for her depression and anxiety by Dr. Finch on five occasions. (Tr.

242, 243, 244, 246, 250). *See Novotny v. Chater*, 72 F.3d 669, 671 (8th Cir. 1995) (per curiam) (failure to seek treatment inconsistent with allegations of pain). On April 30, 2004, Dr. Finch noted that plaintiff's mood had improved via the use of Effexor. (Tr. 244). *See Roth*, 45 F.3d at 282. As such, this medication was continued. There are no records to suggest that plaintiff's condition worsened after this time. Accordingly, we cannot say that plaintiff's depression and/or anxiety was disabling. Further, based on the evidence of record and the fact that plaintiff did undergo one mental status examination, we are also unable to find that the ALJ erred by failing to order a second consultative mental evaluation, as was requested by plaintiff. *See Boyd v. Sullivan,* 960 F.2d 733, 736 (8th Cir.1992) (quoting *Reeves v. Heckler,* 734 F.2d 519, 522 n. 1 (11th Cir.1984)) (finding it reversible error for the ALJ not to order a consultative examination when such an evaluation was necessary to make an informed decision).

Therefore, although it is clear that plaintiff suffers from some degree of pain, she has not established that she is unable to engage in any and all gainful activity. *See Craig v. Apfel*, 212 F.3d 433, 436 (8th Cir. 2000) (holding that mere fact that working may cause pain or discomfort does not mandate a finding of disability); *Woolf v. Shalala*, 3 F.3d at 1213 (holding that, although plaintiff did have degenerative disease of the lumbar spine, the evidence did not support a finding of disabled). Neither the medical evidence nor the reports concerning her daily activities supports plaintiff's contention of total disability. Accordingly, we conclude that substantial evidence supports the ALJ's conclusion that plaintiff's subjective complaints were not totally credible.

Plaintiff also contends that the ALJ erred in finding that he maintained the RFC to perform a range of light work. It is well settled that the ALJ "bears the primary responsibility for assessing

16

a claimant's residual functional capacity based on all relevant evidence." *Roberts v. Apfel*, 222 F.3d 466, 469 (8th Cir. 2000). The United States Court of Appeals for the Eighth Circuit has also stated that a "claimant's residual functional capacity is a medical question," *Singh v. Apfel*, 222 F.3d 448, 451 (8th Cir. 2000), and thus, "some medical evidence," *Dykes v. Apfel*, 223 F.3d 865, 867 (8th Cir. 2000) (per curiam ), must support the determination of the plaintiff's RFC, and the ALJ should obtain medical evidence that addresses the claimant's "ability to function in the workplace." *Nevland v. Apfel*, 2 04 F.3d 853, 858 (8th Cir. 2000). Therefore, in evaluating the plaintiff's RFC, *see* 20 C.F.R. § 404.1545(c), while not limited to considering medical evidence, an ALJ is required to consider at least some supporting evidence from a professional. *Cf. Nevland v. Apfel*, 204 F.3d at 858; *Ford v. Secretary of Health and Human Servs*., 662 F. Supp. 954, 955, 956 (W.D. Ark. 1987) (RFC was "medical question,"and medical evidence was required to establish how claimant's heart attacks affected his RFC).

In the present case, the ALJ considered the medical assessments of non-examining agency medical consultants, a general physical examination, plaintiff's subjective complaints, and her medical records. In July 2003, Dr. Robert Redd, a non-examining Agency medical consultant, prepared an RFC assessment of plaintiff. (Tr. 201-210). Based on the medical evidence, he determined that plaintiff had the ability to lift and carry twenty pounds occasionally and ten pounds frequently; that she could stand and/or walk for at least six hours in an eight-hour workday; that she could sit for a total of about six hours in an eight-hour workday; and that she had unlimited pushing and pulling limitations, other than restrictions related to overhead lifting. (Tr. 202). Dr. Redd also found that plaintiff had limitations in fingering; reaching in all directions; and, frequently, rapidly,

17

and/or repetitively flexing/extending the right wrist. (Tr. 203-206).

On July 17, 2003, Dr. Dan Donahue, a non-examining, consultative psychologist, completed a psychiatric review technique form ("PRTF"), diagnosing plaintiff with an affective disorder, namely a depressive syndrome. (Tr. 211-214). Dr. Donahue found that plaintiff had mild restrictions in her activities of daily living; moderate difficulties in maintaining social functioning; moderate difficulties in maintaining concentration, persistence, and pace; and, no episodes of decompensation. (Tr. 221). Dr. Donahue also completed a mental RFC assessment finding that plaintiff had moderate limitations in her ability to understand, remember, and carry out detailed instructions; maintain attention, and concentration for extended periods; complete a normal workday and workweek without interruptions from psychologically based symptoms; perform at a consistent pace without an unreasonable number and length of rest periods; interact appropriately with the general public; and, set realistic goals or make plans independently of others. (Tr. 226). Based on plaintiff's limitations, Dr. Donahue concluded that plaintiff could perform work where the interpersonal contact required is routine but superficial, the complexity of the tasks is learned by experience, judgment is used within limits, and the supervision required is little for routine but detailed for non-routine tasks. (Tr. 227).

While we do note Dr. Finch's repeated warnings not to drive or use tools or alcohol while taking the prescribed pain medication, we can find no records to suggest that plaintiff actually experienced any side effects from this medication. (Tr. 240, 242-243, 245, 247-249). In fact, the record reveals that plaintiff lived alone with her daughter and remained able to drive both familiar and unfamiliar routes. (Tr. 77, 255, 267). Further, she testified that she had been able to return to

18

work as a laundry attendant and a fast food counter worker after her alleged onset date. (Tr. 256-257, 260). Plaintiff's only asserted reasons for being unable to maintain these positions were related to her inability to lift heavy objects and stand and walk for lengthy periods of time. Therefore, because plaintiff has not alleged that she suffers from medication side effects or that medication side effects played a role in her inability to maintain employment after her alleged onset date, we cannot say that the ALJ erred by failing to consider them in his RFC assessment.

With regard to plaintiff's alleged mental impairments, we note plaintiff's testimony that her ability to maintain attention is "pretty good," and that she had no problem dealing with supervisors or co-workers. (Tr. 271, 272). She also testified that she lived alone with her fifteen-year-old daughter, whom she home schooled; was able to watch television; play cards with her children; and, visit her grandchild and friends. (Tr. 273, 276). As such, we find that substantial evidence supports the ALJ's determination that plaintiff can perform a range of unskilled, light work.

We also find that substantial evidence supports the ALJ's finding that plaintiff can still perform work that exists in significant numbers in the national economy. A VE testified that a person of plaintiff's age and experience, who could perform light, unskilled work, but was unable to perform overhead work with her upper extremity; was limited with regard to reaching in all directions; could not perform activities requiring fine manipulation with the right hand; and, could only perform work where the interpersonal contact was superficial, the tasks were learned by experience, the judgement used was within limits, and the supervision required was little for routine tasks and detailed for non-routines tasks, could still perform simple assembly (i.e., electrical equipment and computer assembly positions), and inspector positions. (Tr. 282). The VE also stated

19

that his testimony was consistent with the information contained in the Dictionary of Occupational Titles. (Tr. 283). After reviewing the evidence of record, we find that the hypothetical question posed to the vocational expert fully set forth the impairments that the ALJ accepted as true and were supported by the record as a whole. *See Long v. Chater*, 108 F.3d 185, 188 (8th Cir. 1997); *Pickney v. Chater*, 96 F.3d 294, 296 (8th Cir. 1996). Accordingly, we find substantial evidence to support the ALJ's determination that plaintiff could still perform work that exists in significant numbers in the national economy.

**Conclusion:**

Accordingly, having carefully reviewed the record, the undersigned finds substantial evidence supporting the ALJ's decision denying the plaintiff benefits, and thus the decision should be affirmed. The undersigned further finds that the plaintiff's Complaint should be dismissed with prejudice.

ENTERED this <u>24th</u> day of July 2006.

<u>/s/ Bobby E. Shepherd</u>
HONORABLE BOBBY E. SHEPHERD
UNITED STATES MAGISTRATE JUDGE

**AO72A**
**(Rev. 8/82)**